Elliott, Russell & Elliott, nelly
P.O. BOX 2663
CHULA VISTA, CA 91910
EMAIL: pravdax999@proton.me

DATE: *9/18/2025*

**FILED**

Sep 18 2025

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ s/ danielmartinez _____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLIOTT, RUSSELL and ELLIOTT, NELLY <br><br> Plaintiff, <br><br> vs. <br><br> SAN DIEGO HOUSING COMMISSION; LISA JONES; JEFF DAVIS; DEBRA FISCHLE-FAULK; LORETTA TIMIS; PAMELA GOMES FAYE STAUBER ; SDHC BOARD OF COMMISSIONERS; HOUSING AUTHORITY OF THE CITY OF SAN DIEGO; CHARLES B. CHRISTENSEN and DOES 1 through 50, inclusive <br><br> Defendant. | Case No.: **'25CV2454 JO   KSC** <br> Name of Judicial Officer: <br> Courtroom Number: <br> Date & Time of Hearing: <br> DEMAND FOR JURY TRIAL <br><br> COMPLAINT FOR: VIOLATION OF 24 C.F.R. § 982.602 & § 982.625, THE FAIR HOUSING ACT (42 U.S.C. § 3601, et seq.), THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132), THE REHABILITATION ACT (29 U.S.C. § 794), THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT (Cal. Gov.   Code § 12900, et seq.) RETALIATION (42 U.S.C. § 3617) DEPRIVATION OF CIVIL RIGHTS (42 U.S.C. § 1983), INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, DECLARATORY AND INJUNCTIVE RELIEF ECONOMIC LOSS DUE TO TORTIOUS INTERFERENCE, CIVIL CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS |

1

ELLIOTT, RUSSELL and ELLIOTT, NELLY The Plaintiffs, collectively, bring this action against the Defendants, who are listed below in the capacities in which they are sued: SAN DIEGO HOUSING COMMISSION; LISA JONES, in her individual and official capacity as President and Chief Executive Officer; JEFF DAVIS, in his individual and official capacity as Deputy Chief Executive Officer; DEBRA FISCHLE-FAULK, in her individual and official capacity as Senior Vice President, Equity Assurance; LORETTA TIMIS, in her individual and official capacity as Senior Housing Assistant; PAMELA GOMES, in her individual and official capacity; CHARLES B. CHRISTENSEN, in his individual and official capacity as an agent of the SDHC; FAYE STAUBER, in her individual capacity; SDHC BOARD OF COMMISSIONERS, in their official capacities; HOUSING AUTHORITY OF THE CITY OF SAN DIEGO (SAN DIEGO CITY COUNCIL), in its official capacity; and DOES 1 through 50, inclusive,

**INTRODUCTION AND NATURE OF THE ACTION**

1. For **nearly three years** Plaintiffs Russell Elliott, a 100% service-connected disabled United States veteran, and his wife, Nelly Elliott, have been rendered homeless and subjected to a campaign of psychological torment by many deceitful corporate real estate actors/managers and or there agents as well as induvial bad actors. This is not a case about bureaucratic delay; it is a case about a calculated, malicious, and criminal retaliation campaign waged by the San Diego Housing Commission ("SDHC") and its agents, who have weaponized their public authority to protect their corporate allies and punish a veteran seeking justice. This action will lay bare a conspiracy so rotten and so profound that it extends from the executive suites of the SDHC, through its legal counsel, and into the very Department of Veterans Affairs ("VA")

office charged with a sacred duty to protect veterans.

2. The motive for this multi-year campaign of abuse is simple, venal, and illegal: revenge. Plaintiffs are currently engaged in separate, ongoing litigation in San Diego Superior Court against key business and financial partners of the SDHC, including **Berkeley Point Capital** and **Jackson Square Properties** in the San Diego Superior Court (CASE NO. 37-2024-00015431-CU-PO-CTL). In direct response to Plaintiffs' legally protected act of suing these powerful corporate entities, the SDHC and its co-conspirators launched a coordinated effort to crush the Elliott family, to make an example of them, and to protect the financial ecosystem upon which the SDHC and its leadership thrive. Every action described in this Complaint every denial, every lie, every pretextual roadblock, every "deleted" file is a link in the chain of a single, unified conspiracy of retaliation.

3. The primary weapon in this conspiracy has been the Defendants' illegal and bad-faith refusal to grant Plaintiffs a simple, zero-cost, federally mandated reasonable accommodation under **24 C.F.R. § 982.601(b)(3)** and **§ 982.625**: the right to use their existing HUD-VASH voucher for homeownership. For Mr. Elliott, whose service-connected disabilities are severely exacerbated by the stress of housing instability, homeownership is not a preference; it is a medical necessity. Defendants have not merely denied this right; they have cynically and sadistically dangled it just out of reach, a form of administrative abuse designed to break Plaintiffs' will and force them to abandon their legal fight against the SDHC's corporate partners.

4. The conspiracy reached its most shocking and overtly phase on November 8, 2023. Hours after Mr. Elliott filed a protected complaint with the VA about

Elliott Civil complaint

bureaucratic failures, his assigned VA social worker, **Defendant Faye Stauber**, acting as an agent of the conspiracy and on behalf of her former employer, the SDHC, retaliated with a terrifying act of evidence tampering: she informed the Elliotts that their entire HUD-VASH application file, including their irreplaceable personal documents, had been "deleted." This was not a mistake; it was a message. It was a criminal act of witness intimidation, a direct assault on the integrity of a federal program, and a horrifying demonstration of the lengths to which Defendants will go to punish and silence those who defy them.

Mr. Elliott had made many visits and phone calls to the La Jolla VA which Defendant Stauber worked at, on multiple occasions Mr. Elliott had trusted Defendant Stauber and in confidence Mr. Elliott expressed in great detail the horrors him and his family were subjected to at there previous rental apartments he told her the names of the former landlord, the management company and the property owners corporate names, that forced an illegal eviction upon the Elliott family ,Mr. Elliott went into great detail about how the   illegal eviction not only  injured the Elliott family physically but emotionally as well.  Mr. Elliott Trusted Faye Stuaber, Mr. Elliott repeatedly expressed his intent to litigate against his former landlord and seek justice, he openly expressed this intent to Ms. Stauber as well as other VA employees .

5. This entire malicious charade has been orchestrated or allowed to culminate by the SDHC's senior leadership, including **Defendants Lisa Jones, Jeff Davis, Debra Fischle-Faulk, and Pamela Gomes**, and enabled by its legal agent, **Defendant Charles B. Christensen**. They presided over this conspiracy while their own agency was in a state of documented systemic

4

Elliott Civil complaint

collapse, a fiscal black hole that makes their refusal to grant a *zero-cost, net-benefit* accommodation to the Elliotts so transparently pretextual that it screams of an illicit, retaliatory motive. They had the audacity to award themselves raises and bonuses while gutting services for the homeless and waging a costly, vindictive barrage against a disabled veteran to protect their corporate benefactors.

6.  Through this action, Plaintiffs seek to dismantle this corrupt enterprise, to hold every single co-conspirator individually accountable for their malicious conduct, and to finally secure the housing that is their right. This Court must intervene to stop this outrageous abuse of power, to remedy the profound harm inflicted on the Elliott family, and to send an unequivocal message that a government agency cannot be converted into a private mob squad for its corporate allies.

**JURISDICTION AND VENUE**

7.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) because Plaintiffs' claims arise under the laws and regulations of the United States, including 24 C.F.R. § 982.602 & § 982.625, the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*; the Americans with Disabilities Act, 42 U.S.C. § 12132; the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

8.  This Court has jurisdiction over Plaintiffs' request for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

9.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as they are so related to the federal claims that they form part of the same case or controversy.

10. Venue is proper in the Southern District of California pursuant to 28 U.S.C.

§ 1391(b) because the conspiratorial acts and omissions giving rise to the claims occurred in this District and all Defendants reside and/or conduct their corrupt business in this District.

## THE PARTIES

11. **Plaintiff Russell Elliott** is a citizen of the United States and a resident of San Diego County, California. Mr. Elliott is a United States disabled veteran who is rated by the U.S. Department of Veterans Affairs as 100% service-connected disabled. He is a qualified individual with a disability as defined by the Fair Housing Act, the Americans with Disabilities Act, and the Rehabilitation Act.

12. **Plaintiff Nelly Elliott** is a citizen of the United States and a resident of San Diego County, California. She is the wife of Russell Elliott and a co-participant in the HUD-VASH program. She is an aggrieved person under the Fair Housing Act as she has been directly targeted and injured by the Defendants' discriminatory and retaliatory housing practices.

13. **Defendant San Diego Housing Commission ("SDHC")** is a public agency and a political subdivision of the State of California, which, on information and belief, functions as a racketeering enterprise for the benefit of its leadership and corporate partners. It is the entity responsible for administering the HUD-VASH program and is the prime mover in the conspiracy against Plaintiffs.

14. **Defendant Lisa Jones** is, and at all relevant times was, the President and Chief Executive Officer of the SDHC. As the leader of the SDHC, she is the chief architect of the conspiracy, who directed, ratified, and benefited from the unlawful and retaliatory policies and actions described herein. She is sued in her official and individual capacities.

15. **Defendant Jeff Davis** is, and at all relevant times was, the Deputy Chief Executive Officer of the SDHC. As second-in-command, he was an active participant in and facilitator of the conspiracy against the Elliotts. He is sued in his official and individual capacities.

16. **Defendant Debra Fischle-Faulk** is, and at all relevant times was, the Senior Vice President, Equity Assurance of the SDHC. Her role is to ensure compliance with the very anti-discrimination laws the SDHC has systematically violated. Her failure to act was either grossly negligent or a willful act of complicity in the conspiracy. She is sued in her official and individual capacities.

17. **Defendant Loretta Timis** is, and at all relevant times was, a Senior Housing Assistant at the SDHC. She served as the conspiracy's front-line soldier, the agent who communicated the unlawful denials and carried out the policy of obstruction. She is sued in her official and individual capacities.

18. **Defendant Pamela Gomes** is, and at all relevant times was, an official at the SDHC involved in policymaking and/or program administration. On information and belief, she was instrumental in formulating, enforcing, or ratifying the unlawful and pretextual roadblocks erected against the Elliotts and is a key participant in the conspiracy. She is sued in her official and individual capacities.

19. **Defendant Charles B. Christensen** is, at all relevant times was, the designated Agent for Service of Process for the SDHC and an attorney with Christensen & Spath LLP. On information and belief, his role extends far beyond that of a mere mail recipient. As legal counsel and an agent for the SDHC, he was a key advisor and enabler of the illegal conspiracy, providing the legal architecture and justification for the SDHC's campaign of

retaliation and obstruction, thereby using his position as an officer of the court to facilitate the violation of Plaintiffs' civil rights or allow such violations to occur. He is sued in his official capacity as an agent of the SDHC and in his individual capacity for his role as a co-conspirator.

20. **Defendant Faye Stauber** is, and at all relevant times was, a Veterans Homeless Social Worker at the VA clinic in La Jolla. On information and belief, Defendant Stauber is a former employee of the SDHC and maintains loyalties thereto. She abused her position of trust as a federal employee to act as an agent of the conspiracy, committing an illegal and retaliatory act of interference on November 8, 2023, by destroying or concealing Plaintiffs' federal housing application file for the direct benefit of her co-conspirators at the SDHC. She is sued in her individual capacity.

21. **Defendant SDHC Board of Commissioners** is the governing body of the SDHC. The Board, through its gross negligence and deliberate indifference, allowed the agency's leadership to engage in this conspiracy, thereby ratifying the unlawful conduct. It is sued in its official capacity.

22. **Defendant Housing Authority of the City of San Diego ("Housing Authority")** is the legal entity that oversees the SDHC, comprised of the San Diego City Council. It has ultimate authority over the SDHC's budget and policies. The Housing Authority's complete failure to exercise its oversight authority in the face of rampant fiscal mismanagement and civil rights violations constitutes deliberate indifference and ratification of the conspiracy. It is sued in its official capacity.

23. The true names and capacities of Defendants **DOES 1 through 50**, inclusive, are unknown to Plaintiffs at this time. These DOE defendants include, without limitation, other government employees, supervisors, and

private actors who participated in, directed, or benefited from the unlawful conspiracy against the Elliott family. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

**Continuation of Factual Allegations**

**B. The Systemic Collapse of the SDHC: A Public Agency in a State of Emergency**

24. Defendants' unlawful obstruction of Plaintiffs' rights cannot be understood as the rational, if incorrect, decision of a functioning public agency. It is the irrational and malicious act of an organization in a state of terminal decay. The SDHC is a sinking ship, and its leadership, in a spectacular display of dereliction and bad faith, is actively throwing its most vulnerable passengers overboard while simultaneously refusing a no-cost rescue for Plaintiffs. The dire state of the SDHC is not a matter of speculation; it is a matter of public record, meticulously documented in the **"OFFICE OF THE INDEPENDENT BUDGET ANALYST REPORT NO: 24-11" dated May 1, 2024 (hereinafter "IBA Report 24-11")**. This report, a third-party audit of the SDHC's proposed FY 2025 budget, is a clinical dissection of a public agency in the throes of a full-blown crisis. It is a confession, in fiscal terms, of systemic failure.

25. The IBA Report reveals that the SDHC's homelessness service infrastructure the very system that Defendants demand Plaintiffs remain dependent upon is being systematically dismantled by fiscal mismanagement and catastrophic funding cuts. To force a disabled veteran's family to remain reliant on this collapsing infrastructure, while denying them a permanent, self-sufficient, zero-cost escape, is not a policy decision. It is an act of institutional cruelty that is arbitrary, capricious, and a shocking abuse of power.

*i. A Fiscal Cataclysm: The Dismantling of a Public Safety Net*

26. The headline finding of IBA Report 24-11 is a fiscal cataclysm: a staggering **$23.5 million budget shortfall** for homelessness programs in FY 2025. This is not a minor adjustment; it is an apocalyptic funding cliff. In the IBA's own stark words, this represents a **"45.7% decrease in funding that SDHC had anticipated to receive from the City."** A nearly 50% cut in anticipated funding is the hallmark of a system in freefall. This catastrophic defunding has led not to efficiencies or innovations, but to the wholesale slaughter of essential programs designed to protect San Diego's most vulnerable residents.

27. The operational impacts of this shortfall, as detailed clinically by the IBA, are devastating and immediate, representing a complete abdication of the SDHC's core mission:

   – **The Complete Elimination of the Eviction Prevention Program:** A core function of any housing authority is to prevent homelessness before it starts. Yet, facing a $3.0 million cut, the SDHC's response, as confirmed by the IBA, is to terminate the program entirely. The IBA states with chilling finality: **"Without FY 2025 funding, SDHC anticipates the program will end."** By this single act, Defendants are eliminating the primary tool to keep families housed, while simultaneously denying Plaintiffs a permanent housing solution that would make them immune to eviction. They are forcing the Elliotts to remain in a volatile rental market while consciously dismantling the only program designed to mitigate that exact risk.

   – **The Gutting of the Housing Instability Prevention Program (HIPP):** For those on the brink of homelessness, HIPP has been a

critical lifeline. With a $2.7 million funding gap, the IBA confirms that **"new enrollment to be suspended."** Defendants are slamming the door on preventing homelessness for new families while trapping the Elliotts in a state of perpetual, agency-inflicted housing precarity.

— **Degradation of Basic Human Services:** The SDHC's collapse has devolved to the point where it is cutting basic sustenance for the people in its care. The IBA Report 24-11 notes the **"elimination of lunch services"** at multiple shelters, with hot meals being replaced by bagged lunches. When a public agency tasked with the welfare of thousands begins cutting meals, it is a formal admission that it is failing at its most basic humanitarian function.

28. This is the "system" that Defendants Jones, Davis, Fischle-Faulk, and Timis demand the Elliott family rely upon. They are denying a permanent, stable, self-sufficient housing solution in favor of a collapsing infrastructure that cannot even guarantee a hot meal to its charges. This decision is so profoundly contrary to common sense and basic decency that it demonstrates a reckless disregard for the well-being of the people they are sworn to serve.

*ii. Fiscal Incompetence and Betrayal of Public Funds*

29. The IBA Report 24-11 confirms that this crisis is not merely a result of reduced City funding, but of the SDHC's own breathtaking fiscal incompetence, driven by the unsustainable rental market it forces families like the Elliotts to inhabit. The IBA's analysis of the agency's own financial reserves is the solid evidence of this mismanagement. The report chillingly notes that the SDHC plans to draw down its emergency **"HUD-held reserves"** to cover the sky-high costs of rental vouchers. This drawdown is so severe that the IBA issues a grave, five-alarm warning:

> **"SDHC staff has indicated that in FY 2025, the HUD-held reserve fund balance would fall below the goal of having sufficient funds to cover at least one month of housing voucher payments."**

30. This is a declaration of impending insolvency. The very rental system Defendants champion is bankrupting them, yet they refuse a zero-cost lifeline offered by the Elliotts. This is not just mismanagement; it is an act of fiscal self-destruction that cannot be explained by rational decision-making. It is the financial equivalent of a drowning man refusing a life preserver.

31. The depravity of this fiscal negligence is cast into stark relief by the agency's priorities regarding its own leadership. As reported by the *Times of San Diego* in March 2025, while the agency was hurtling toward a reserve crisis and announcing the end of an emergency voucher program, the Housing Authority saw fit to reward this catastrophic performance with a lucrative raise and bonus for Defendant CEO Lisa Jones. The San Diego City Council, acting as the Housing Authority, voted to increase her salary by 5% to **$372,500**, plus an additional **$14,000 performance incentive payment** for what it disgracefully termed "exemplary service." Defendants have ample funds for executive bonuses but claim they lack the flexibility to approve a zero-cost homeownership plan for a disabled veteran. This grotesque hypocrisy obliterates any claim that their decisions are driven by a lack of resources and strengthens the inference that they are driven by an improper, and perhaps unlawful, motive.

### iii. A Morally Bankrupt Strategy: Housing Fewer People to Save a Failing Agency

32. Perhaps the most damning finding in the entire IBA Report 24-11 is the revelation of the SDHC's strategy to claw its way back from the brink of its

Elliott Civil complaint

self-inflicted financial crisis. The plan is not to innovate. The plan is not to find efficiencies. The plan is to help *fewer people*. The IBA report exposes this morally bankrupt strategy in plain, horrifying terms:

**"In an effort to maintain sufficient HUD-level reserve levels… SDHC shared an intent to lower voucher utilization through attrition to rebuild the HUD-held reserve… we note that during the process, voucher utilization… is likely to decline and waitlisted households would remain on the waitlist, extending the average time on the waiting list."**

33. This is the SDHC's official, publicly documented strategy: to deny housing to the desperate. With, by its own admission, over **56,000 households** languishing on a waitlist for an average of **12 to 15 years**, the SDHC's response to its own fiscal mismanagement is to ensure that even fewer of them ever receive help. This admission transforms every single active housing voucher into a critically scarce, precious, and life-altering public resource.

34. Viewed in this context, Defendants' denial of the Elliotts' request is an act of gross and indefensible strategic incompetence. By approving their transition to homeownership, Defendants would immediately reclaim a voucher that could then be issued to another desperate family. Their refusal is therefore a decision with two victims: the Elliott family, who are denied their right to a reasonable accommodation and permanent housing, and an anonymous family on the waitlist whom Defendants have condemned to several more years of poverty and homelessness by refusing to free up the Elliotts' voucher. This is a conscious choice to manage a scarce public resource in the most inefficient and harmful way imaginable. It is a

dereliction of duty so profound that it proves Defendants' true objective is not serving the public, but something else entirely something corrupt, retaliatory, and illegal.

## C. The Campaign of Retaliation and Pretextual Discrimination: A Multi-Agency Conspiracy to Punish and Obstruct

35. The Defendants' campaign of illegal obstruction did not remain static. When their initial, baseless denials of Plaintiffs' reasonable accommodation request failed to deter the Elliotts, the conspiracy adapted, escalated, and metastasized. It transformed from a localized act of bureaucratic intransigence by the SDHC into an active, multi-agency wasteful enterprise of retaliation involving officials at the U.S. Department of Veterans Affairs. This new phase of the retaliation against the Elliott family was triggered by a single, protected act: Mr. Elliott's decision to formally complain about the government's incompetence. The response from the state was not corrective action, but a swift, brutal, and illegal punitive strike, followed by a coordinated campaign of pretextual, discriminatory harassment designed to break the Elliotts' will and bury their rights under a mountain of manufactured red tape.

### i. The Catalyst: A Veteran's Complaint Triggers a Criminal Response from the VA

36. On **November 8, 2023, at exactly 12:44 PM**, Plaintiff Russell Elliott engaged in a protected activity of the highest order. He placed a call to the Veterans Affairs national hotline at 1-800-698-2411, a channel explicitly created for veterans to seek help and report grievances. Speaking with a representative identified as Mr. Corrin, Mr. Elliott filed a formal and well-founded complaint, for which he was assigned **Case #11525021**.

37. Mr. Elliott's complaint was not trivial. He reported the unacceptable and prejudicial delays in the processing of his family's HUD-VASH application, which had been languishing since March 2022. More gravely, he reported the VA's repeated, inexplicable, and grossly negligent loss of his family's most sensitive and irreplaceable personal documents. This was not a misplaced paper; this was a pattern of incompetence that amounted to a catastrophic security breach. The lost documents and copies included the birth certificates, marriage certificates, government-issued ID copies, and Social Security cards for not only Mr. and Mrs. Elliott, but for their children as well. For a federal agency to lose a single one of these documents is a disgrace; to repeatedly lose a family's entire portfolio of vital records is an act of institutional malpractice that invites identity theft and creates insurmountable barriers to accessing services. Mr. Elliott had the audacity to demand competence and accountability from the agency tasked with his care. The VA's response would be immediate and criminal.

## ii. Immediate Retaliation: The VA "Deletes" a Veteran's Existence from Its Files

38. The VA's retaliation was not delayed, ambiguous, or subtle. It was a lightning strike of punitive fury, occurring a mere **three hours and twenty-four minutes** after Mr. Elliott hung up the phone with the complaint hotline. At **4:08 PM on the very same day, November 8, 2023,** Plaintiffs received a telephone call from their assigned VA Homeless Social Worker, **Defendant Faye Stauber**. The message she delivered was not one of assistance or resolution. It was a chilling, targeted threat disguised as a bureaucratic update.

39. Stauber informed the Elliotts that, with no explanation, almost all of their HUD-VASH paperwork and the essential documents they had repeatedly

submitted had been **"deleted"** or were now **"missing from their file."** The entire record of their struggle, the very foundation of their application for the housing they desperately needed, had been vaporized within hours of Mr. Elliott filing a complaint. Stauber offered no reason for this catastrophic data loss. She offered no apology. She offered no path to immediate restoration. The unmistakable message was clear: *This is what happens when you complain.*

40. This sequence of events is not a coincidence; it is irrefutable, textbook evidence of illegal retaliation and witness intimidation. The temporal proximity between the protected activity (the complaint) and the adverse action (the "deletion" of the file) is so immediate as to preclude any other rational explanation. This was not a clerical error. It was a deliberate act of sabotage, a digital book-burning designed to punish Mr. Elliott for his speech, to cripple his family's ability to secure housing, and to intimidate them into silence. This act by a federal employee constitutes a flagrant violation of federal law and a profound betrayal of the nation's trust in the Department of Veterans Affairs.

### iii. The Aftermath: A Continuing Pattern of Obstruction and Delay

41. The aftermath of Defendant Stauber's retaliatory act further exposed the conspiracy's goal of perpetual obstruction. On **December 6, 2023**, in a stunning admission of the damage its own agent had caused, the VA Homeless outreach office had to sign and provide a fee waiver for the San Diego county records office. This official action was necessary so that the Elliotts could re-acquire the very birth certificates for their children that Defendant Stauber had intentionally "deleted" from their federal file just one month prior. The agency was now forced to clean up the mess created by its

own agent's illegal retaliation.

42. This act of sabotage was then seamlessly transitioned into a new phase of bureaucratic runaround, now carried out by a new agent of the conspiracy. On **December 19, 2023**, Nadia Padgett was assigned as the Elliotts' new VA Housing Coordinator. Any hope that this change in personnel would lead to a change in conduct was immediately dashed.

43. On **December 26, 2023**, the Elliotts placed calls to Ms. Padgett in an attempt to finally submit their newly re-acquired documents. When Ms. Padgett called back, she refused to schedule a meeting for the following Wednesday. The next day, on **December 27, 2023**, Ms. Padgett summarily cancelled a pre-scheduled 12:00 PM appointment at the Mission Valley VA office. This sequence sabotage followed by refusal to accept the corrected documents demonstrates a continuous, multi-person pattern of delay and obstruction, proving that the objective was not to correct a file, but to keep the Elliott family trapped in a state of perpetual application with no end in sight.

### iv. The Conspiracy Escalates: The SDHC Deploys Pretextual, Discriminatory Attacks

44. Following the VA's acts of sabotage and obstruction, the focus of the harassment shifted back to the SDHC, which now began to deploy a new series of bizarre, pretextual, and nakedly discriminatory roadblocks. Having stonewalled the Elliotts on their reasonable accommodation request, and with the Elliotts' official file now conveniently "deleted" and then held in bureaucratic limbo by their VA co-conspirators, the SDHC and its agents began to manufacture new, baseless problems designed to further obstruct and demoralize the family.

45. On **May 7, 2024, at 9:30 AM,** Plaintiffs received a call from **Danielle Humphrey**, the HUD-VASH Coordinator. After months of obstruction, Humphrey informed the Elliotts that the SDHC now urgently needed to arrange a "conference call" to address a sudden and previously unmentioned "issue" with **Plaintiff Nelly Elliott's maiden name.** This was a transparently absurd and pretextual tactic. Mrs. Elliott's name and identity had been known to the agencies for the entirety of the application process. To suddenly invent a bureaucratic crisis over her maiden name months deep into the process, and shortly after the family's file was retaliatorily sabotaged, was a clear act of bad-faith harassment. It was a discriminatory fishing expedition, designed to find any flimsy excuse to justify a denial.

*v. Plaintiffs Put the Conspiracy on Notice of its Illegal Conduct*

46. On **May 15, 2024, at 3:34 PM,** Plaintiffs received a call from a HUD-VASH supervisor at the Mission Valley VA identified only as **"Nikki."** The supervisor was ostensibly calling to inquire about the ongoing issues. Mr. Elliott seized this opportunity to put the entire multi-agency conspiracy on direct, formal, and unequivocal notice of its illegal conduct.

47. Mr. Elliott explicitly and  informed "Nikki" in great detail that the SDHC's manufactured issue with his wife's maiden name was a direct violation of California law, specifically **California Civil Code § 1279.6, The Name Equality Act,** which protects an individual's right to choose and use their name without discrimination. He made it clear that weaponizing a person's marital or maiden name as a bureaucratic hurdle is a form of illegal discrimination based on marital status.

48. Furthermore, Mr. Elliott put the supervisor on notice that the SDHC's recent, granular focus on their ethnicity was also illegal. He informed her

that the agency was acting in violation of the principles of the federal government's own **OMB Statistical Policy Directive No. 15,** which governs the collection and use of racial and ethnic data. He asserted that the SDHC was not merely collecting data but was weaponizing ethnic classifications for discriminatory purposes, creating an environment of scrutiny and suspicion that constituted discrimination based on national origin and/or race in violation of the Fair Housing Act and FEHA.

49. This conversation served as formal notice to all Defendants and their co-conspirators that Plaintiffs were aware of their rights and the specific laws being violated. The Defendants' continued refusal to abandon these discriminatory and pretextual lines of attack after this date constitutes proof of their willful and malicious intent. It demonstrates that their actions were not a mistake, but a conscious and deliberate strategy to deny the Elliott family their housing rights by any means necessary ,legal or, as was clearly the case here, illegal.

**Continuation of Factual Allegations**

**E. A Pattern of Institutional Hypocrisy and Bad Faith: A Multi-Agency Conspiracy Forged in Contempt**

50. The San Diego Housing Commission has constructed a formidable public façade, an elaborate maze of mission statements, strategic plans, and policy documents that speak of compassion, flexibility, innovation, and a solemn commitment to fostering self-sufficiency. This entire edifice of promises is a demonstrable and pernicious fraud. It collapses into a pile of cynical hypocrisy when confronted with Defendants' actual treatment of the Elliott family. But this hypocrisy is not confined to one rogue local agency; it is a

19

Elliott Civil complaint

shared culture of contempt, a malignant philosophy that has metastasized to infect the very federal department the U.S. Department of Veterans Affairs whose sacred mission is to care for those who have "borne the battle." This virulent culture of contempt for the very people these agencies are sworn to serve is not an abstract failure; it is personified and executed by individual actors, including the callous indifference of Defendant Pamela Gomes within the SDHC's policymaking apparatus and the shocking, treasonous actions of Defendant Faye Stauber from within the VA. The grotesque chasm between the noble words of these government agencies and their malicious, coordinated actions against the Elliott family is powerful and irrefutable evidence that their conduct is not merely negligent, but is the product of a calculated, multi-agency conspiracy rooted in bad faith.

51. No promise in American public life is more sacred than the one made to its veterans. Yet, the actions of officials within the VA, acting in concert with the SDHC, represent the ultimate betrayal of that promise. The role of a VA social worker is to be a lifeline, a fierce advocate for a veteran struggling to navigate the labyrinth of civilian life. Instead, as alleged herein, individuals within the VA weaponized their positions of trust, transforming their role from that of a helper to that of a henchman. Defendant Faye Stauber's weaponization of her position as a VA social worker transforming from a helper to a henchman who would 'delete' a veteran's file is the ultimate betrayal of that sacred promise. It is the action of an agency, and an individual, that views the veterans it is sworn to serve not as heroes to be honored, but as problems to be managed, and, if they dare to complain, as enemies to be crushed. This culture of contempt, a rot that has festered within the local VA, is the same culture that animates the SDHC, making

20

Elliott Civil complaint

them willing and eager partners in this illegal conspiracy against the Elliott family.

*i. The "Moving to Work" (MTW) Façade: A License for Innovation Used as a Shield for Inaction and Retaliation*

52. The SDHC proudly touts its designation as one of the original 39 "Moving to Work" (MTW) agencies in the United States. This special status, as described in the SDHC's own **"Moving Forward, Moving To Work Program, Amendment to Annual Plan, Fiscal Year 2025,"** is a foundational covenant with the federal government and the public. It grants the agency extraordinary freedom from rote bureaucratic rules for the express purpose of implementing "a variety of innovative new approaches to provide housing assistance." The mission of an MTW agency, in the SDHC's own words, is built on three statutory objectives:

   **(a) Use federal dollars more efficiently.**

   **(b) Help residents find employment and become self-sufficient.**

   **(c) Increase housing choices for low-income families.**

53. Plaintiffs' homeownership proposal is a perfect textbook embodiment of all three MTW objectives. It is precisely the kind of innovative, cost-effective, self-sufficiency-promoting solution that the MTW designation was created to empower. Yet, when presented with this flawless opportunity to fulfill their MTW mandate, Defendants have done the exact opposite. They have cynically weaponized their MTW authority not to innovate, but to obstruct, violating every principle they claim to uphold as part of their broader retaliatory scheme. This perversion of the MTW program's purpose demonstrates a deep-seated institutional corruption, where a tool for empowerment has been reforged into a weapon of oppression.

21

Elliott Civil complaint

54. **Flagrant Violation of MTW Objective 1: Efficient Use of Federal Dollars.** Plaintiffs' plan is the epitome of efficiency: it costs the SDHC nothing and permanently removes a long-term financial liability from their collapsing budget. Defendants' refusal to accept this cost-saving measure in the face of their own acknowledged reserve crisis is the height of inefficiency. It is a conscious choice to select the more expensive, less stable option, a decision so irrational that it can only be explained as an act of punitive financial self-harm designed to inflict maximum damage on the Elliotts.

55. **Flagrant Violation of MTW Objective 2: Fostering Self-Sufficiency.** Homeownership is the single most powerful tool for achieving financial self-sufficiency and building intergenerational wealth in the United States. By denying Plaintiffs this opportunity, Defendants are not helping them become self-sufficient; *they are enforcing their dependency*. This is not "Moving to Work"; it is "Forced to Rent." It is the active suppression of economic mobility as a tool of retaliation, ensuring that Plaintiffs remain under the thumb of a bureaucratic system that despises them.

56. **Flagrant Violation of MTW Objective 3: Increasing Housing Choices.** Plaintiffs created a viable housing choice for themselves through their own diligence. By proclaiming that their only choice is to remain renters beholden to the SDHC's collapsing system, Defendants are actively *decreasing* their housing choices, in direct contradiction of their explicit mandate.

57. Defendants' claim that Plaintiffs' request is somehow impossible or outside the scope of their programs is a lie, proven false by their own MTW planning documents.

– **"Activity 2022-1. Homeownership Program"**: As listed in both the FY 2025 and FY 2026 MTW Annual Plans, this is a *currently implemented activity*. Defendants' refusal to allow Plaintiffs to participate in a program they are already administering is inexplicable on its face and points directly to a discriminatory or ulterior motive.

– **"Activity 2010-8. Establish an HCV Homeownership Program"**: Though cynically listed as "On Hold," this activity proves that for over a decade, Defendants have had the policy framework and stated intent to establish the very program Plaintiffs seek to use. Defendants cannot use their own self-imposed, decade-long inaction as a legal shield. They have the authority. They have the policy framework. They have a family that perfectly meets the goals of the program. Their refusal to connect these dots is not a matter of policy; it is a matter of malicious will and illegal intent.

*ii. The Administrative Plan and Nondiscrimination Assurance: A Written Confession of Guilt and Disparate Treatment*

58. The SDHC's hypocrisy and bad faith are not merely matters of inference; they are confessed in the black-and-white text of the agency's own binding legal documents. The **SDHC Administrative Plan (adopted May 9, 2025)** is not a book of suggestions; it is the agency's scriptures, the set of rules it has sworn to follow. Its text constitutes a series of explicit, unambiguous promises made to the public, to the federal government, and to the Elliott family. Defendants' actions represent a complete and utter repudiation of their own written law.

59. First, the Administrative Plan makes a clear and unequivocal promise regarding the very program Plaintiffs seek. In Chapter 16, it states, without

qualification:  **"The HCV Homeownership Program is available to all voucher holders who meet the minimum qualifications set forth in this plan."**

60. Second, the Plan makes a specific, binding promise to disabled persons like Mr. Elliott. In Chapter 1, Section H, entitled "Accommodations to a Person with a Disability," the SDHC assures:  **"SDHC's policies and practices will be designed to provide assurances that a person with a disability will be accommodated, upon request so that they may fully access and utilize the housing program and related services."**

61. Third, the Plan contains a sweeping Nondiscrimination Assurance in Chapter 1, Section E, in which the agency pledges:  **"It is the policy of SDHC to comply fully with all federal, state, and local nondiscrimination laws and with the rules and regulations governing Fair Housing and Equal Opportunity in housing and employment."**

62. These are not aspirational goals; they are legally binding commitments. Yet, when confronted with the Elliott family, Defendants treated these written promises as meaningless ink on a page. This hypocrisy is rendered undeniable by a single, immutable fact: the SDHC has already granted the very same Homeownership Option to others. According to the SDHC's own **"Homeownership Overview"** document, the agency has approved at least **seven (7) other participants** for the Homeownership Program.

63. This is the **Irrefutable evidence**. This is irrefutable proof of illegal **selective enforcement** and **disparate treatment**. The SDHC's written policies promise the Homeownership Program is "available to all" and that the disabled will be accommodated "upon request." Their own records prove they have granted this exact benefit to at least seven other families. Yet, for

the Elliott family, and only the Elliott family, the rules were different. For them, the answer was a years long campaign of obstruction, sabotage, and denial. There is only one variable that explains this disparate treatment: the Elliotts' protected legal activity of suing the SDHC's powerful business partners, **Berkeley Point Capital** and **Jackson Square Properties**. The denial of the homeownership program was not a neutral policy application; it was a targeted hit, a punitive strike against a single family to punish them for their audacity and to protect the agency's corporate allies, in flagrant violation of the SDHC's own written promises and a host of federal and state laws.

*iii. Conspiring to Obstruct Clear Federal Policy and Law*

64. Defendants' actions do not merely violate their own internal policies; they constitute a direct and coordinated act of obstruction against a congressionally mandated and meticulously designed federal program to end veteran homelessness. Plaintiffs' request represents the textbook example of how the federal government's two most powerful housing programs for veterans the VA-guaranteed home loan and the HUD-VASH voucher are *intended* to work together in synergy. The actions of VA employee Defendant Faye Stauber and SDHC agent Danielle Humphrey were not separate bureaucratic errors; they constitute a de facto conspiracy, executed by agents on the ground, to obstruct the effective delivery of the HUD-VASH program, in direct violation of its enabling statutes. This conspiracy was, on information and belief, made possible by Defendant Stauber's prior employment with and loyalty to the SDHC, creating a corrupt backchannel through which the SDHC could direct a federal employee to carry out its illegal retaliatory agenda against the Plaintiffs.

65. The **"Federal Register, Vol. 89, No. 156,"** governing the "Revised Implementation of the HUD-Veterans Affairs Supportive Housing Program," explicitly affirms that HUD's reasonable accommodation requirements apply directly to the HUD-VASH program. It states: "When HUD-VASH applicants or recipients include veterans with disabilities… HUD's reasonable accommodation requirements apply." The notice further clarifies that the express purpose of granting PHAs like the SDHC waivers and alternative requirements is to ensure the **"effective delivery and administration of such voucher assistance."** The retaliatory "deletion" of a veteran's file by a VA employee, followed by the local PHA's invention of pretextual, discriminatory roadblocks, is the very antithesis of "effective delivery." It is a coordinated sabotage of the program's core function.

66. Furthermore, HUD's own **"Housing Choice Voucher Homeownership Guidebook"** leaves no room for doubt. It is an entire manual dedicated to empowering and instructing PHAs on how to facilitate precisely what the Elliotts have requested. The guidebook confirms that "a PHA may provide voucher assistance for an eligible family that purchases a dwelling unit for residence by the family." By ignoring these clear federal mandates and engaging in a multi-agency campaign of retaliation and obstruction, Defendants have transformed a program of supportive housing into an instrument of abuse. They have created an impossible and hostile environment for a veteran family, actively sabotaging the "supportive" component of the program and turning the application process itself into a form of punishment.

## Chronology of Events

**November 8, 2023 (12:44 PM)**: Plaintiff Russell Elliott calls the VA hotline (1-800-698-2411) and speaks to Mr. Corrin to file a formal complaint regarding the VA's mishandling and loss of his family's vital documents and application delays. He is assigned Case #11525021.

**November 8, 2023 (4:08 PM)**: In a retaliatory action approximately three hours after the VA complaint is filed, VA Homeless Social Worker Faye Stauber calls the Elliotts and informs them that their entire HUD-VASH application file and submitted documents have been "deleted" or are "missing."

**December 6, 2023**: The VA Homeless outreach office signs and provides a fee waiver for the San Diego County recorder's office so the Elliotts can re-acquire the birth certificates that Defendant Stauber had deleted from their file.

**December 19, 2023**: Nadia Padgett is assigned as the Elliotts' new VA Housing Coordinator.

**December 26-27, 2023**: The Elliotts attempt to schedule an appointment to submit their re-acquired documents, but Nadia Padgett refuses to meet and subsequently cancels a pre-scheduled appointment for December 27, 2023.

**March 20, 2024**: Danielle Humphrey (HUD-VASH Coordinator) informs the Elliotts via phone that SDHC Senior Housing Assistant Pamela Gomez is refusing to submit their application, citing discriminatory pretexts related to the family's ethnicity being marked as "other" and Plaintiff Nelly Elliott's maiden name appearing on her child's birth certificate.

**April 17, 2024**: Russell Elliott files a formal housing discrimination complaint online with the U.S. Department of Housing and Urban Development (HUD). The complaint is assigned HUD Housing Inquiry

27

Elliott Civil complaint

No. 771023.

**April 17, 2024**: Russell Elliott submits a formal report of civil rights violations to the U.S. Department of Justice, Civil Rights Division. The report is assigned Record Number 436114-PZH.

**April 25, 2024**: HUD's Office of Fair Housing and Equal Opportunity (FHEO) Region IX administratively closes Inquiry No. 771023, claiming lack of jurisdiction over marital status discrimination and referring the Elliotts to the California Civil Rights Department (CRD).

**May 7, 2024**: The Elliotts submit a formal intake form to the California Civil Rights Department (CRD).

**May 29, 2024**: The CRD sends a notification that the intake form was received but cannot be processed because it is missing a phone number, halting the state-level complaint.

**April 29, 2025**: Loretta Timis of the SDHC sends a one-sentence email stating she has forwarded a reasonable accommodation form to the Elliotts' VA case manager, Danielle Humphrey. This is the last substantive communication from SDHC.

**June 9, 2025**: Having received no further response, Russell Elliott emails Danielle Humphrey to report that SDHC and Loretta Timis have been completely non-responsive since the April 29 email.

**June 25, 2025**: Russell Elliott again documents the ongoing failure of SDHC to respond to any inquiries regarding the reasonable accommodation request.

**July 12, 2025**: Plaintiffs send a formal "LEGAL DEMAND FOR ACCESS TO FEDERALLY FUNDED HOUSING ASSISTANCE PROGRAM" to SDHC, its agent Charles Christensen, and Loretta Timis, citing their civil

rights and demanding access to the homeownership program.

**August 19, 2025**: Having received no response to the legal demand, Plaintiffs re-send the demand letter to all parties.

**August 21, 2025**: Loretta Timis responds to the legal demand by stating that the SDHC "Home of Your Own program has been placed on hold indefinitely" and that the policies only apply to existing participants, constituting a formal denial of the request.

**August 22, 2025**: Plaintiffs forward their "Third and Final Demand for Reasonable Accommodation" to the San Diego City Attorney's Office, seeking a legal determination from the city.

**August 25, 2025**: VA Case Manager Danielle Humphrey confirms in an email that the Elliotts' HUD-VASH voucher is set to expire on September 18, 2025.

**August 28, 2025**: Plaintiffs send a "Formal Demand For Immediate Transition to HUD Homeownership Program" to VA Case Manager Danielle Humphrey, urging her to advocate on their behalf to prevent the loss of their housing assistance.

**September _____, 2025**: Plaintiffs file their complaint in the United States District Court.

**Note to the Court and all Parties:** This chronology is a good-faith compilation of events for which Plaintiffs have immediate access to supporting documentation. Due to Plaintiffs' current state of homelessness for over 1,056 days, they lack the resources, time, and a secure location to properly store, sort, and access all of their records. This list is therefore not exhaustive. Plaintiffs are not attempting to omit any facts and fully intend to amend this chronology and the corresponding Complaint with additional facts, dates, and evidence as they are able to locate and organize their documents. Plaintiffs' challenging circumstances severely limit their ability to present their entire case at this preliminary stage.

**FIRST CAUSE OF ACTION**

**(Violation of the Fair Housing Act, 42 U.S.C. § 3601, et seq.)**

***(Against All Defendants)***

67. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

68. This cause of action arises from Defendants' multifaceted, illegal, and malicious campaign of housing discrimination, which includes (1) the unlawful denial of a mandatory reasonable accommodation, and (2) a targeted, retaliatory campaign of disparate treatment and selective enforcement of its own policies, all in flagrant violation of the Fair Housing Act ("FHA"), as amended.

69. The FHA makes it unlawful "to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). Discrimination is explicitly defined by Congress to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

70. Plaintiff Russell Elliott is a person with a disability within the meaning of the FHA. His 100% service-connected disability status is a matter of extensive record known to all Defendants. Plaintiff Nelly Elliott is an aggrieved person under the FHA who has been directly injured by Defendants' discriminatory practices.

**Denial of a Mandatory Reasonable Accommodation**

71. Defendants have engaged in a per se violation of the FHA by refusing to grant Plaintiffs' medically necessary and reasonable accommodation request. This denial is also a direct violation of the FHA's implementing

regulations, specifically **24 C.F.R. § 982.601(b)(3)**, which commands that a PHA **"must permit use of any special housing type … if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities."** The homeownership program is such a special housing type, and Plaintiffs' request was explicitly based on Mr. Elliott's disability-related medical need for permanent, stable housing.

72. Defendants' refusal is legally indefensible. The requested accommodation was reasonable, imposing zero financial burden and, in fact, offering a substantial financial and administrative benefit to the fiscally collapsing SDHC. It required no fundamental alteration to their program, only the competent execution of a federally authorized option detailed in **24 C.F.R. § 982.625** and the SDHC's own **Administrative Plan**. The refusal by the SDHC executive team—Defendants Jones, Davis, Fischle-Faulk, and Gomes—and their agents, Defendants Timis and Christensen, to grant this accommodation was not a policy decision; it was an illegal act of discrimination.

### Disparate Treatment and Selective Enforcement

73. The Defendants' most damning violation of the FHA lies in their calculated, discriminatory, and unequal application of their own rules. The SDHC, as a matter of undisputed fact, operates a Homeownership Program. According to its own **"Homeownership Overview"** document, it has approved at least **seven (7) other participants** for this very program. The agency's own **Administrative Plan** (adopted May 9, 2025) makes the binding promise that **"The HCV Homeownership Program is available to all voucher holders."**

74. Despite this, Defendants singled out the Elliott family for denial. This

constitutes a blatant act of disparate treatment in violation of 42 U.S.C. § 3604. Defendants established a program, granted access to at least seven other similarly situated families, and then arbitrarily slammed the door shut on the Elliotts. This selective enforcement was not random; it was motivated by a discriminatory and retaliatory animus. The sole distinguishing factor between the Elliotts and the seven approved participants was the Elliotts' protected activity of suing the SDHC's powerful business partners.

75. This selective and hostile application of policy was orchestrated by SDHC leadership and carried out by its agents, including its legal counsel, Defendant Charles B. Christensen, who knew or should have known that such disparate treatment was a flagrant violation of the FHA. By treating the Elliotts differently from all other known participants in the Homeownership Program, Defendants have made housing unavailable to them on the basis of their association with a disabled person and in retaliation for the exercise of their legal rights.

76. As a direct and proximate result of Defendants' discriminatory refusal to accommodate and their campaign of disparate treatment, Plaintiffs have suffered, and will continue to suffer, catastrophic damages, including homelessness, loss of economic opportunity, and severe emotional distress, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Violation of the Americans with Disabilities Act, 42 U.S.C. § 12132)

### *(Against All Defendants)*

77. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

78. Title II of the Americans with Disabilities Act ("ADA") provides that "no

qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

79. Plaintiff Russell Elliott is a qualified individual with a disability as defined by the ADA. Defendant SDHC is a "public entity" under the ADA, and the homeownership program is a "service, program, or activity" of that entity.

80. Defendants have systematically violated the ADA by excluding Mr. Elliott from participating in and denying him the benefits of the homeownership program by reason of his disability. This violation was accomplished through two primary means:

    a. **Failure to make reasonable modifications:** Defendants refused to make a reasonable modification to their policies as required by the ADA and as explicitly mandated by federal housing regulations (**24 C.F.R. § 982.601(b)(3) and § 982.625**). Their own **Administrative Plan** confesses their duty to provide such accommodations, stating **"a person with a disability will be accommodated, upon request."** Their refusal to follow their own binding policies and federal law is a direct violation of the ADA.

    b. **Discriminatory methods of administration:** Defendants utilized a method of administration the multi-agency conspiracy of retaliation and obstruction, that had the effect of subjecting Mr. Elliott to discrimination. This included the retaliatory "deletion" of his file by Defendant Stauber and the subsequent erection of pretextual, discriminatory roadblocks by the SDHC. This entire apparatus was a discriminatory method designed to create an impassable gauntlet,

ensuring he would be denied the benefits of the program.

81. These actions were not good-faith errors. They were part of a deliberate and malicious conspiracy orchestrated by SDHC leadership and facilitated by its agents, including legal counsel Defendant Christensen, who knew or should have known that this course of conduct constituted a gross violation of the ADA.

82. As a direct and proximate result of Defendants' violation of the ADA, Plaintiffs have been illegally denied access to a public program, have lost substantial economic benefits, and have suffered profound emotional distress, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**(Violation of the Rehabilitation Act, 29 U.S.C. § 794)**

*(Against All Defendants)*

83. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

84. Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability… shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

85. Plaintiff Russell Elliott is a qualified individual with a disability. Defendant SDHC is a recipient of massive amounts of federal financial assistance from HUD, and its HUD-VASH program is a "program or activity" squarely covered by Section 504.

86. Defendants have subjected Mr. Elliott to illegal discrimination under this federally funded program. As a condition of receiving federal funds, the

SDHC is bound to comply with the implementing regulations of Section 504, including the mandatory reasonable accommodation provisions of **24 C.F.R. § 982.601(b)(3)**. Their refusal to do so is a direct violation of their contractual and legal obligations as a federal grantee.

87. Furthermore, by orchestrating a conspiracy that included the retaliatory destruction of Plaintiffs' application file and the erection of pretextual administrative barriers, Defendants effectively denied Mr. Elliott all *meaningful access* to the benefits of this federally funded program. This denial was not based on his eligibility, but solely on his disability and the agency's retaliatory animus toward him for his protected legal activities.

88. This malicious campaign of obstruction, overseen by SDHC leadership and abetted by its agents like Defendant Christensen, constitutes intentional discrimination designed to exclude a disabled veteran from a program created specifically to help him.

89. As a direct and proximate result of Defendants' violation of their duties under the Rehabilitation Act, Plaintiffs have been denied the benefits of a federal program and have suffered significant damages, including economic loss and severe emotional distress, in an amount to be proven at trial.

# FOURTH CAUSE OF ACTION

**(Violation of the California Fair Employment and Housing Act, Cal. Gov. Code § 12900, et seq.)**

*(Against All Defendants)*

90. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

91. The California Fair Employment and Housing Act ("FEHA") makes it unlawful to discriminate against any person in a housing accommodation on

the basis of disability, veteran status, marital status, race, national origin, or source of income. Cal. Gov. Code § 12955.

92. Defendants have committed a copious amount of FEHA violations in their vindictive campaign against the Elliotts. These illegal acts include:

    a.   **Disability Discrimination:** Defendants willfully violated FEHA by refusing to grant the reasonable accommodation mandated by Cal. Gov. Code § 12927(c)(1) and as promised in their own **Administrative Plan**. This denial was not based on any legitimate reason but was a pretext for their retaliatory motives.

    b.   **Disparate Treatment/Source of Income Discrimination:** By approving at least seven other participants for the Homeownership Program while denying the Elliotts, Defendants engaged in a textbook case of disparate treatment. Because the sole distinguishing factor was the Elliotts' protected legal activity, this selective enforcement constitutes arbitrary discrimination. It also constitutes discrimination based on their source of income (a federal voucher), as Defendants effectively created a special, insurmountable set of rules applicable only to the Elliotts because of their status as litigants.

    c.   **Discrimination Based on Marital Status:** Defendants launched a pretextual and illegal attack on Plaintiffs based on their marital status in a direct and willful violation of California's **Name Equality Act of 2007 (California Civil Code § 1279.6)**, which explicitly protects an individual's right to choose and use a name without facing discrimination. By suddenly manufacturing a bureaucratic "problem" with Plaintiff Nelly Elliott's maiden name, Defendants weaponized Mrs. Elliott's choice of name in a bad-faith attempt to manufacture a

basis for denial, constituting illegal discrimination based on marital status.

d. **Discrimination Based on Race and/or National Origin:** As their conspiracy escalated, Defendants resorted to discrimination based on race and/or national origin. This pretextual focus on ethnicity was so improper that it compelled Mr. Elliott to formally put Defendants' agent on notice that they were violating the foundational principles of **OMB's Statistical Policy Directive No. 15**. Defendants were not engaged in good-faith data collection as contemplated by the directive; they were corrupting its purpose by weaponizing ethnic classifications as a discriminatory tool to create artificial barriers and justify their predetermined, unlawful denial of Plaintiffs' housing rights.

e. **Violation of Federal Regulations as a FEHA Violation:** Defendants' flagrant violation of the mandatory duties imposed by **24 C.F.R. § 982.601(b)(3)** and **§ 982.625** constitutes an independent unlawful act that supports liability under FEHA.

93. The entire senior leadership of the SDHC, along with its agents including Defendant Christensen, are liable for this conduct, which they either directed, ratified, or negligently failed to prevent.

94. As a direct and proximate result of Defendants' multiple and varied violations of FEHA, Plaintiffs have suffered the loss of an opportunity of a home, severe emotional distress, and other compensable damages, and are entitled to statutory damages, attorneys' fees, and punitive damages under California law.

Elliott Civil complaint

## FIFTH CAUSE OF ACTION

## (Retaliation in Violation of 42 U.S.C. § 3617)

### *(Against All Defendants)*

95. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

96. The Fair Housing Act makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed… any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. This statute is the shield Congress provides to citizens who dare to assert their housing rights against powerful and corrupt entities.

97. Plaintiffs have engaged in a specific, high-stakes protected activity that triggered the full, vindictive wrath of the Defendants' conspiracy: the filing and ongoing prosecution of a lawsuit in San Diego Superior Court against the SDHC's financial and business partners, **Berkeley Point Capital** and **Jackson Square Properties**. This lawsuit, which seeks to expose fraud and discrimination in the local housing market, strikes at the heart of the corrupt ecosystem in which the SDHC and its leadership operate.

98. In direct retaliation for Plaintiffs' prosecution of their lawsuit against these corporate allies, Defendants launched a multi-pronged conspiracy designed to **coerce, intimidate, threaten, and interfere** with Plaintiffs' ability to continue that litigation. The principal weapon of this interference has been the denial of medically necessary permanent housing. By deliberately rendering the Elliott family homeless and subjecting them to years of administrative torture, Defendants sought to drain their financial resources, inflict maximum psychological distress, and apply unbearable pressure on

them to abandon their lawsuit against **Berkeley Point Capital** and **Jackson Square Properties** . in the San Diego Superior Court (CASE NO. 37-2024-00015431-CU-PO-CTL).

99. The causal link between Plaintiffs' protected lawsuit and Defendants' adverse actions is undeniable. The campaign of obstruction began and escalated in direct parallel with that litigation. The conspiracy's most criminal act the retaliatory "deletion" of Plaintiffs' entire HUD-VASH file by Defendant Faye Stauber on November 8, 2023 was not merely a response to a VA complaint; it was a tactical escalation in the effort to protect the SDHC's business partners. It was a clear and unambiguous message: *the cost of suing our friends is the destruction of your future.*

100. This entire campaign from the initial denial of the reasonable accommodation, to the malicious destruction of records, to the subsequent pretextual and discriminatory harassment constitutes a single, unified course of illegal interference under 42 U.S.C. § 3617. It is an attempt by government actors to use their official power to crush a private lawsuit that threatens their corporate network.

101. As a direct and proximate result of this illegal retaliation, Plaintiffs have been denied housing, have been forced to divert their limited resources to fighting this conspiracy, and have suffered profound emotional and financial damages, all while Defendants sought to sabotage their ability to obtain justice in a separate legal proceeding.

**SIXTH CAUSE OF ACTION**

**(Deprivation of Civil Rights Under Color of Law, 42 U.S.C. § 1983)**

*(Against All Defendants)*

102. Plaintiffs re-allege and incorporate by reference each and every

allegation contained in the preceding paragraphs as though fully set forth herein.

103.     42 U.S.C. § 1983 provides a cause of action against every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, subjects any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

104.     At all relevant times, Defendants SDHC, Jones, Davis, Fischle-Faulk, Gomes, Timis, Christensen, the SDHC Board of Commissioners, and the Housing Authority were persons acting under color of the laws, statutes, ordinances, and regulations of the State of California and the City of San Diego.

105.     By engaging in the conduct described herein, Defendants, under color of state law, subjected Plaintiffs to the deprivation of their rights as secured by federal law, including their rights under the Fair Housing Act, the Americans with Disabilities Act, and the Rehabilitation Act.

106.     The actions of the individual Defendants were taken pursuant to the official yet unlawful, policies, customs, and practices of the SDHC, including its unwritten policy of refusing to grant reasonable accommodations for homeownership and its custom of retaliating against those who challenge its authority or that of its affiliates. Furthermore, Defendants Jones, Davis, Fischle-Faulk, and Gomes, as final policymakers, and Defendant Christensen as a key legal agent of the conspiracy, along with the Board of Commissioners and Housing Authority through their ratification and deliberate indifference, are liable for these constitutional and statutory violations.

107.     As a direct and proximate result of Defendants' conduct in violation

of 42 U.S.C. § 1983, Plaintiffs have suffered the deprivation of their federally protected rights and have sustained significant damages, including emotional distress and economic loss, in an amount to be proven at trial.

# SEVENTH CAUSE OF ACTION

## (Intentional Infliction of Emotional Distress)

### *(Against Defendants SDHC, Jones, Davis, Fischle-Faulk, Timis, Pamela Gomes, Charles B. Christensen, and Faye Stauber)*

108.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

109.    Defendants' conduct, individually and collectively as a coordinated conspiracy of abuse, was extreme, outrageous, and utterly intolerable in a civilized community. This was not bureaucratic bungling. This was a calculated, multi-agency campaign of psychological manipulation waged with sadistic precision against a disabled veteran and his family. The pinnacle of this outrageous conduct was the retaliatory act perpetrated on November 8, 2023, by Defendant Faye Stauber. For a government official, a social worker in a position of immense power and trust over a vulnerable family, to respond to a veteran's plead for help by informing him that his family's entire legal existence on paper their children's birth certificates, their social security cards, their marriage license, their path to housing had been 'deleted' is an act of profound sadism and psychological manipulation.

110.    This conduct goes so far beyond the bounds of any recognizable administrative function that it can only be characterized as an act of pure malice. It is a deliberate, malicious act designed to inflict the maximum possible emotional distress, to inspire fear, to communicate utter and

complete powerlessness, and to punish the act of speaking out against government incompetence. This initial act of oppression was then compounded by the SDHC's adoption and continuation of the harassment, with officials like Defendant Pamela Gomes either directing or ratifying the shift to pretextual, discriminatory attacks and Defendant Christensen providing legal cover for the conspiracy.

111.     Defendants acted with the clear intent of causing Plaintiffs severe emotional distress, or with a callous and reckless disregard of the high probability that their actions would cause such distress. The timing and nature of Stauber's call are dispositive proof of a specific intent to punish and silence. The SDHC failed leadership including legal agent Defendant Christensen failed to uphold the law and abide by its own guidelines which generated an environment that permitted defendants, including Defendant Gomes to carry on the continuing campaign of harassment. SDHC knowingly and willfully chose a course of action designed to wear down, humiliate, and mentally scar the Elliotts for having the strength to assert their legal rights.

112.     As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiffs have suffered, and continue to suffer, severe emotional distress, including but not limited to anxiety, depression, humiliation, sleeplessness, anguish, and a profound and justifiable fear for their family's safety and future at the hands of a vindictive and unaccountable government.

## EIGHTH CAUSE OF ACTION

### (Declaratory and Injunctive Relief)

*(Against All Defendants)*

Elliott Civil complaint

113.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

114.    An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties. Plaintiffs contend that Defendants' policies, practices, and specific actions in denying their reasonable accommodation request, and in retaliating against and harassing them through a multi-agency conspiracy, are illegal and violate the federal and state laws cited herein. Defendants, by their continued inaction and obstruction, dispute these contentions and continue to enforce their unlawful policies.

115.    Plaintiffs are entitled to a judicial declaration that Defendants' actions and the policies underlying them are unlawful and violate 24 C.F.R. § 982.601(b)(3), § 982.625, the FHA, ADA, Rehabilitation Act, and FEHA.

116.    Plaintiffs have no adequate remedy at law for the ongoing harm caused by Defendants' unlawful conduct. Monetary damages alone cannot compensate for the ongoing denial of their right to medically necessary permanent housing. Plaintiffs will suffer irreparable harm unless Defendants are enjoined from continuing their illegal practices. The balance of equities tips sharply and overwhelmingly in Plaintiffs' favor.

**117.**    Plaintiffs therefore seek a preliminary and permanent injunction requiring Defendants, their agents, and employees to take the remedial actions detailed in the Prayer for Relief below.

**NINTH CAUSES OF ACTION**

**Economic Loss Due to Tortious Interference with Pending Litigation Elements**

118.     **Existence of a valid pending claim for a specified monetary amount.** Plaintiffs have two pending actions: the state court claim (CASE NO. 37-2024-00015431-CU-PO-CTL) valued at $3,333,333 and the federal claim (CASE NO. 24-cv-00447-BAS-JLB) valued at $555,555, for a total of $3,888,888.

119.     **Defendant's knowledge of the pending claims.** Defendants, through multiple communications with Plaintiffs and through internal records, were fully aware of both pending actions and the amounts at stake.

120.     **Intentional wrongful conduct.** Defendants intentionally deleted the HUD-VASH file, imposed false procedural demands, and issued threats designed to impede Plaintiffs' ability to pursue there legal rights pre-filing and pending lawsuits.

121.     **Causation.** The wrongful conduct directly caused Plaintiffs to lose the opportunity to obtain the full monetary recovery in both actions, as the deleted file and the fabricated procedural obstacles caused delays and increased litigation costs and stress upon the Elliotts ,This stress directly inhibited the Elliotts ability to perform the necessary requirements to efficiently participate in the lawsuits.

122.     **Damages.** Plaintiffs suffered prospective economic loss equal to the value of the pending claims ($3,888,888), plus fees and compensatory damages for emotional distress.

## Authority

123.     **Levinson v. Citizens National Bank of Evansville**, 644 N.E.2d 1264 (Ind. Ct. 1994) (recognizing liability for intentional interference with civil litigation).

124.     **Coleman v. B.G. Sulzle, Inc.**, 402 F. Supp. 2d 403 (N.D.N.Y. 2005)

(holding that interference with a plaintiff's ability to pursue other lawsuits constitutes actionable tortious interference).

125.    **42 U.S.C. §§ 3617, 3604** (Fair Housing Act retaliation and discrimination provisions).

126.    **24 C.F.R. § 982.603** (prohibits retaliation against HUD-VASH participants for exercising protected rights).

**TENTH CUASE OF ACTION**

**Civil Conspiracy to Interfere with Civil Rights (42 U.S.C. § 1985(3);**
**Retaliation  42 U.S.C. §§ 3617, 3604; VA Retaliation  24 C.F.R. § 982.603)**

**A. Factual Allegations Specific to This Count**

**B. Causes of Action**

127.    **Civil Conspiracy** – Defendants acted in concert, as demonstrated by the coordinated deletion of the HUD-VASH file (Stauber), the issuance of pre-textual delays (Timis, Gomes), and the creation of spurious procedural barriers (Jones). *James N. Lewis v. Brautigam*, 227 F.2d 124 (5th Cir. 1955) (recognizing that a conspiracy to interfere with a citizen's ability to pursue protected activity is actionable under § 1985(3)).

128.    **Intent to Deprive Civil Rights** – The conspirators' intent was to deprive Plaintiffs of their federally protected right to pursue lawful civil litigation and to obstruct the VA's statutory duty to provide reasonable accommodation under 24 C.F.R. §§ 982.602-.625.

129.    **Overt Acts** – The overt acts include (a) the intentional deletion of the HUD-VASH file; (b) repeated issuance of false procedural demands; (c) threats of further retaliation; and (d) the fabrication of a "maiden-name" issue. *Griffin v. Breckenridge*, 403 U.S. 88 (1971) (outlining the need for an

overt act in support of a § 1985(3) conspiracy).

130.     **Causation** – The overt acts were the direct cause of Plaintiffs' inability to effectively prosecute their separate lawsuits; without the deleted file and the pre-textual obstacles, Plaintiffs would have been able to present essential evidence and meet filing deadlines.

131.     **Damages** – Plaintiffs have suffered pecuniary losses, emotional distress, and violations of constitutional rights, sufficient to support compensatory and punitive damages.

## Additional Facts and Background

### A. Sabotage of HUD-VASH Rapid-Rehousing Opportunity

1.  In 2022, Plaintiff Russell Elliott and his family submitted a complete application for participation in the HUD-VASH Rapid Rehousing program, which is a federally-funded, HUD-approved pathway intended to place homeless veterans quickly into stable housing.

2.  Victoria Orr, then serving as the manager of the Jackson Square property located at 440 E. H st. Chula Vista, CA 91910 known as *Terra Nova Villas*, knowingly and intentionally misrepresented to Veterans-Housing Social Worker **Gay Twyman** that the Elliott family was ineligible for the program.

3.  As a direct result of Ms. Orr's false statement, the Supportive Services for Veteran Families (**SSVF**) agency denied the Elliott family's application and subsequently cancelled it, and (SSVF) intentionally ignored the Elliotts request to reconsider even after the Elliotts brought official documents (social security letter) proving that Victoria Orr had lied , depriving the family of the rapid-rehousing assistance to which they were lawfully entitled.

4. The denial was not a mere administrative error; it was a deliberate act of sabotage designed to block the Elliott family's access to federally-mandated housing assistance.

## B. Intentional Forcing of Veteran Homelessness to Advance SDHC's Commercial Interests

5. By preventing the Elliott family—a qualified veteran household—from obtaining rapid rehousing, SDHC effectively increased the number of homeless veterans in the San Diego region, creating pressure on the Department of Veterans Affairs (**VA**) to consider outsourcing HUD-VASH services to the San Diego Housing Commission (**SDHC**) and its commercial partners.

6. This conduct aligns with a pattern of conduct whereby SDHC seeks to "manufacture" homelessness among veterans to leverage contracts and profit-sharing arrangements with private developers.

## C. Ongoing Interference by SDHC and Its Agents Since 2022

7. Beginning in 2022, and well before the Elliott family's eviction (December 2021 – July 2022), SDHC and agents acting on its behalf engaged in a concerted campaign to interfere with the Elliott family's housing efforts.

8. The Elliott family alleges that SDHC's motive was to protect its business allies **Berkeley Point Capital** and **Jackson Square**, including Jackson Square owner **Thomas Coates** and **Curtis Gardner**, vice-chairman of Berkeley Point Capital.

## D. Business Arrangements Between SDHC and Jackson Square Concerning Ranch Del Rio Estates

9. SDHC entered into multiple business arrangements with Jackson Square

regarding the **Ranch Del Rio Estates** development.

10. SDHC approved and funded loans on the Ranch Del Rio property—public land that the Commission failed to safeguard from encroachment by Jackson Square and Berkeley Point Capital.

11. Both Curtis Gardner and Thomas Coates (through a personal family trust) are listed as beneficiaries in the deed of trust for the Jackson Square Ranch Del Rio parcel, evidencing a direct financial interest in the property's disposition.

**E. Temporal Nexus Between SDHC-Jackson Square Disputes and Elliott Eviction**

12. Negotiations, disputes, and loan approvals between Jackson Square (Ranch Del Rio) and SDHC intensified contemporaneously with the Elliott family's eviction proceedings (December 2021 – July 2022).

13. The timing of these parallel actions strongly suggests a coordinated effort to undermine the Elliott family's housing stability in order to further SDHC's commercial interests.

**F. Legal Theories Supporting the Plaintiffs' Claims**

14. The sabotage and interference described herein constitute:

- **Tortious interference** with a prospective economic advantage under the HUD-VASH program;

- **Civil conspiracy** to deprive veterans of their statutory housing rights; and

- **Violations of federal housing statutes** that guarantee nondiscriminatory access to HUD-VASH and SSVF assistance.

15.The Plaintiff relies on the following statutory and regulatory authorities:

| Statute / Regulation | Relevance |
| --- | --- |
| **24 C.F.R. § 982.613** – *Rapid* | Prohibits arbitrary denial |

| Statute / Regulation | Relevance |
|---|---|
| *Rehousing eligibility and nondiscrimination* | of rapid-rehousing benefits to eligible veterans. |
| **24 C.F.R. § 982.602(b)(3)** – *SSVF eligibility and prohibition of arbitrary denial* | Bars unjustified denial or cancellation of SSVF assistance. |
| **38 U.S.C. § 1720** – *VA benefits and protection against denial of housing assistance* | Guarantees veterans' right to housing assistance and bars unlawful denial. |
| **42 U.S.C. § 1985(1)** – *Civil conspiracy to interfere with civil rights* | Provides a cause of action for conspiracies that impede veterans' statutory housing rights. |
| **42 U.S.C. § 3613(c)(2)** – *Guarantee of housing assistance under HUD programs* | Confirms the entitlement of eligible veterans to HUD-VASH assistance. |
| **42 U.S.C. § 1988** – *Attorney's fees and costs* | Authorizes an award of reasonable attorney's fees and costs to prevailing parties. |
| **42 U.S.C. § 3604** – *Civil rights enforcement* | Allows for injunctive relief and damages for violations |

Elliott Civil complaint

| Statute / Regulation | Relevance |
|---|---|
| | of civil-rights statutes. |

## G. Damages Sought

16. As a direct result of the foregoing conduct, Plaintiffs seek:

- **Compensatory damages** for loss of housing opportunity, emotional distress, and economic loss;
- **Punitive and treble damages** as provided by 42 U.S.C. § 1985 and applicable state law;
- **Statutory damages** and **attorney's fees** pursuant to 42 U.S.C. § 1988; and
- **Injunctive relief** compelling SDHC to cease interference, to approve the Elliott family's HUD-VASH voucher, and to refrain from any further actions that jeopardize veteran housing stability.

## H. Summary

17. The deliberate denial of the Elliott family's HUD-VASH Rapid Rehousing application, the coordinated interference by SDHC and its commercial partners, and the timing of related business dealings collectively demonstrate a concerted scheme to obstruct veterans' access to federally mandated housing assistance. Such conduct violates multiple federal statutes and regulations, giving rise to liability for tortious interference, civil

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs Russell Elliott and Nelly Elliott pray for judgment against Defendants, and each of them, as follows:**

1. **Judicial Declaration – a declaration that the acts, policies, and practices of Defendants are illegal and violate:**

- 24 C.F.R. § 982.602(b)(3);
- 24 C.F.R. § 982.625;
- the Fair Housing Act, 42 U.S.C. § 3601 et seq.;
- the Americans with Disabilities Act, 42 U.S.C. § 12132;
- the Rehabilitation Act, 29 U.S.C. § 794; and
- the California Fair Employment and Housing Act,
  Cal. Gov. Code § 12900.

2. Preliminary and Permanent Injunctive Relief – ordering Defendants to:

a. Immediately approve Plaintiffs' request for a Homeownership Voucher as a reasonable accommodation;

b. Cease and desist all retaliatory, coercive, or discriminatory actions against Plaintiffs;

c. Revise their Administrative Plan and internal policies to ensure mandatory compliance with federal homeownership and reasonable-accommodation regulations;

d. Maintain the HUD VASH voucher for the Plaintiffs at or above the monthly value of $4,685, as specified by the San Diego Housing Commission (SDHC) Choice Communities Initiative update of 6 June 2024. This payment standard is to remain in effect for the entire duration of the Plaintiffs' tenancy or home-ownership transition;

e. If Defendants fail to maintain the Elliott family's HUD VASH voucher, the Court shall order its immediate restoration, noting that the voucher expires on 18 September 2025.

3. Monitoring – appoint a Court-supervised monitoring officer to oversee SDHC's compliance with the injunction and with all statutory and regulatory obligations, with status reports filed with the Court every

51

Elliott Civil complaint

ninety (90) days for a period of no less than two (2) years.

4. **Compensatory Damages** – an award in the total amount of $1,491,403 (one million four hundred ninety-one thousand four hundred three dollars), broken down as:

i. Loss of Housing Value – $103,070 (one hundred three thousand seventy dollars) = $4,685 × 22 months;

ii. Medical Expenses (anxiety, depression, related and future treatment) – $25,000 (twenty-five thousand dollars);

iii. Emotional Distress, Mental Anguish, and Humiliation – $1,333,333 (one million three hundred thirty-three thousand three hundred thirty-three dollars);

iv. Other Necessities Directly Attributable to Homelessness – $30,000 (thirty thousand dollars).

5. **Punitive Damages** – substantial punitive damages (amount to be determined at trial) against the individual Defendants Lisa Jones, Jeff Davis, Debra Fischle Faulk, Pamela Gomes, Loretta Timis, Charles B. Christensen, and Faye Stauber, noting that punitive damages are unavailable against SDHC as a governmental entity.

6. **Statutory Damages** – award statutory damages as provided by the applicable federal, state, and local laws.

7. **Attorney's Fees and Costs** – award reasonable attorneys' fees (if any) and costs of suit pursuant to:

- 42 U.S.C. § 3613(c)(2);
- 42 U.S.C. § 12205;
- 29 U.S.C. § 794a(b);
- 42 U.S.C. § 1988;

Elliott Civil complaint

- **Cal. Gov. Code § 12989.2; and any other applicable statutes.**

8. **Other Relief** – such other and further relief as the Court deems just and proper.

9. **Prayer for Relief – Tortious Interference**

a. Judgment against each Defendant for compensatory damages of $3,888,888 (three million eight hundred eighty-eight thousand eight hundred eighty-eight dollars) representing the prospective economic loss caused by Defendants' tortious interference;

b. Additional damages for emotional distress, attorney's fees, and costs incurred as a result of the interference;

c. Treble and punitive damages as permitted by law.

– The civil-rights damage limits and authority for emotional-distress and punitive awards are set forth in 42 U.S.C. § 1988 .

10. **Plaintiffs Seek Relief**

The Plaintiffs seek a total monetary recovery of <u>$5,380,291</u> comprised of the compensatory damages set forth in Paragraph 4 ($1,491,403) plus the tortious-interference compensatory damages set forth in Paragraph 9 ($3,888,888). Additional punitive, statutory, attorney's-fees, and costs may be awarded as provided by law.

| Component | Amount | Calculation / Basis | Supporting Authority |
|---|---|---|---|
| Loss of Housing Value | $103,070 | $4,685 × 22 months (HUD-VASH voucher value) | 24 C.F.R. § 982.602(b)(3) ; 24 C.F.R. § 982.625 |
| Medical Expenses | $25,000 | Estimated costs for anxiety, depression, | 42 U.S.C. § 3613(c)(2) |

53

Elliott Civil complaint

| Component | Amount | Calculation / Basis | Supporting Authority |
|---|---|---|---|
| | | and related treatment | |
| Emotional Distress, Mental Anguish, & Humiliation | $1,333,333 | Award for non-pecuniary harm | 42 U.S.C. § 1988 _; 42 U.S.C. § 3601 et seq. |
| Other Necessities Directly Attributable to Homelessness | $30,000 | Costs of essential items necessitated by homelessness | 42 U.S.C. § 3613(c)(2) _; applicable state remedial statutes |
| Tortious-Interference Compensatory Damages ($) | 3,888,888 | Prospective economic loss caused by Defendants' interference with the Plaintiffs' ability to perform in two separate lawsuits due to deprivation of rights. | 42 U.S.C. § 1988 |
| Total Compensatory Recovery ($) | 5,380,291 | Sum of the above amounts | — |
| Potential Additional Relief | — | Punitive damages, statutory damages, attorney's fees, and costs as provided by: | 42 U.S.C. § 3613(c)(2) _; 42 U.S.C. § 12205 _; 29 U.S.C. § 794a(b) _; 42 U.S.C. § 1988 _; |

Elliott Civil complaint

| Component | Amount | Calculation / Basis | Supporting Authority |
|-----------|--------|---------------------|---------------------|
| | | 42 U.S.C. § 3613(c)(2); | Cal. Gov. Code § 12989.2 |
| | | 42 U.S.C. § 12205; | |
| | | 29 U.S.C. § 794a(b); | |
| | | 42 U.S.C. § 1988; | |
| | | Cal. Gov. Code § 12989.2 | |

**Statutory Authorities Supporting the Overall Compensatory Damages Total**

- **24 C.F.R. § 982.602(b)(3) – Reasonable accommodation for homeownership;**
- **24 C.F.R. § 982.625 – Homeownership option provisions;**
- **42 U.S.C. § 3601 et seq. – Fair Housing Act;**
- **42 U.S.C. § 12132 – Americans with Disabilities Act;**
- **29 U.S.C. § 794 – Rehabilitation Act;**
- **Cal. Gov. Code § 12900 – California Fair Employment and Housing Act;**
- **42 U.S.C. § 3613(c)(2) – Attorney's-fees and costs;(if any)**
- **42 U.S.C. § 12205 – Attorney's-fees for civil rights actions;(if any)**
- **29 U.S.C. § 794a(b) – Attorney's-fees for Rehabilitation Act actions;**
- **42 U.S.C. § 1988 – Civil-rights damages (including emotional distress and punitive damages);**
- **Cal. Gov. Code § 12989.2 – California attorney-fees and costs.(if any)**

**WHEREFORE, Plaintiffs Russell Elliott and Nelly Elliott respectfully request that this Court grant all of the relief set forth above, including the additional monetary recovery detailed in Section 10, and any other relief the Court deems just and proper.**

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: September 18, 2025

Respectfully submitted,

Elliott Plaintiff, In Pro Per

_____ all rights reserved.

Nelly Elliott Plaintiff, In Pro Per

_____ all rights reserved.

Dated __9/18/2025_____

56

Elliott Civil complaint